COURT OF APPEALS OF VIRGINIA

Present:  Judges Malveaux, Fulton and Friedman
Argued at Norfolk, Virginia


DAQUAIL RAMON JOHNSON
                                                           MEMORANDUM OPINION* BY
v.        Record No. 1176-21-1                             JUDGE FRANK K. FRIEDMAN
                                                           OCTOBER 25, 2022
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
                              Kenneth R. Melvin, Judge

              Meghan Shapiro, Senior Assistant Public Defender (Virginia
              Indigent Defense Commission, on briefs), for appellant.

              Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
              Miyares, Attorney General, on brief), for appellee.


        A jury convicted Daquail Johnson of rape, in violation of Code § 18.2-61.  On appeal, he

asserts that the evidence was insufficient to support the conviction.  For the following reasons, we

disagree and affirm.

                                      BACKGROUND[1]

        G.T.[2] met appellant at a 7-Eleven one night in July 2020.  Appellant told her his name was

"Sky Blue."  G.T. and appellant exchanged phone numbers and made plans to meet in a nearby park

the next morning.  They met the next day and talked for an hour.  They did not discuss sex on that

occasion.  Appellant and G.T. met again within a few days at G.T.'s house, where they sat in

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] "In accordance with familiar principles of appellate review, the facts will be stated in the
light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*,
295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).

[2] Because G.T. was seventeen at the time of the offense, we refer to her by her initials.

appellant's car and talked for "a good 30 minutes." They then met again three or four times before August 4, 2020. On all these occasions they just talked. Once, appellant asked if G.T. ever thought about sex, and he tried to convince her to have sex with him, but G.T. declined. A day or two before August 4, 2020, G.T. noticed that appellant was wearing a hospital tag with his real name on it. She also saw baby clothes and diapers in the backseat of appellant's car. Appellant told G.T. that his sister was in the hospital having a baby.

At around 11:00 a.m. on the morning of August 4, 2020, appellant picked G.T. up and they drove to a Mini Mart. Appellant then drove G.T. to an alley very close to her house. The alleyway was narrow, with only enough room for the car to pass through, but not enough to open the doors. Appellant parked the car and began talking to G.T. about sex. Appellant then moved over, reclined G.T.'s car seat, and got on top of her, saying, "young girls as yourself like to see an older male take control." He grabbed one of G.T.'s hands, "put it above [her] head on the headrest of the passenger seat," and tried to pull her sweatpants down. As G.T. struggled to pull her pants back up, appellant grabbed her other hand and pinned her down. Appellant took her pants down and put his penis in her vagina. G.T. said "no" and asked appellant to stop, but he continued to have sex with her for four to five minutes. When he finished, appellant got off G.T., "wiped blood off his penis with a baby's onesie," and then took G.T. home. He told G.T. "that's how a grown woman pleases her man," and he said he loved her. Later that day, appellant called G.T. and "kind of made fun of the incident," telling her that she "couldn't take a penis."

After she got home, G.T. contacted a friend and reported that appellant had "forced" himself on her. She was "shocked," scared, and ashamed of what had happened. G.T. told her mother and her godmother, Joyce Evans, about the incident four days later on August 8, 2020. The next day, Evans and G.T. met with appellant at the Mini Mart to confront him about what he had done. When Evans asked appellant how old he was, appellant gave three different ages: seventeen, twenty, and

- 2 -

twenty-three.[3]  When Evans asked appellant what made him assume G.T. would "want such things," appellant "laughed it off" and denied that he would ever do such a thing because he has daughters.  However, when Evans asked appellant why he did not stop when G.T. asked him to, appellant responded, "a lot of hot girls say stop, but they don't really mean it."  When Evans asked appellant if he knew G.T. was a virgin, he said "no" and apologized.

Portsmouth Police Detective D.A. Misiewicz testified that G.T.'s mother provided her with the name associated with appellant's Facebook account, "Loud Pacc."  Neither G.T. nor her mother provided appellant's real name, and G.T. did not mention the hospital tag.  Nevertheless, using his Facebook profile, Misiewicz identified appellant as a suspect and then created a photo lineup to show G.T.  G.T. picked appellant out of the lineup.

Portsmouth Police Detective A. Vanderslice testified that he took appellant into custody on the outstanding rape warrant on December 2, 2020.  On his arrest, appellant began making "spontaneous utterances," and stated, "I did have sex with the girl, but we had sex twice.  Why would you put a rape on me if we had sex twice?"  Appellant continued, "you know what my problem is though?  You know what my problem is?  Putting my dick in everything."

After the Commonwealth rested its case, appellant made a motion to strike arguing that G.T.'s testimony was incredible and that the Commonwealth did not establish the elements of rape.  The trial court denied the motion to strike.

Appellant's fiancée, Nikita Grant, testified on his behalf.  Grant explained that appellant was the father of her newborn baby, who was born on August 3, 2020.  Grant was admitted to the hospital for labor on August 2, 2020, and she remained in the hospital until August 5.  While in the hospital, Grant tested positive for COVID.  As a result, she and the baby were quarantined in the hospital room.  Grant testified that appellant stayed with her in the hospital during the entirety of her

_____

[3] Appellant was twenty-four years old.

stay. Grant confirmed that appellant posted a video of himself and the baby on Facebook Live from the hospital at 6:34 a.m. on August 4, 2020. The video was entered into evidence as a defense exhibit at trial.

Appellant renewed his motion to strike, arguing that G.T.'s testimony was insufficient to prove appellant had sexual intercourse with her against her will by force, threat, or intimidation. Appellant argued that G.T.'s testimony was inherently unbelievable, and he contended that the evidence proved he was in the hospital with Grant at the time of the offense. The trial court denied his motion to strike, and the jury later returned a guilty verdict. This appeal followed.

ANALYSIS

Appellant argues that the evidence in this case was insufficient to support his conviction, first, because the Commonwealth failed to disprove his alibi, and second, because G.T.'s testimony was not credible as a matter of law. He concludes that no "rational trier of fact" would have found appellant guilty of the crime beyond a reasonable doubt. Disagreeing with both assertions, we affirm.

"This Court reviews a challenge to the sufficiency of the evidence 'in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible from the evidence.'" *Bondi v. Commonwealth*, 70 Va. App. 79, 87 (2019) (quoting *Cooper v. Commonwealth*, 31 Va. App. 643, 646 (2000) (*en banc*)). "In conducting our review, we do not substitute our own judgment for that of the factfinder." *Id.* "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (*en banc*) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will not reverse the trial court's judgment unless its decision "is plainly wrong or without evidence to support it." *Marshall v. Commonwealth*, 69 Va. App. 648, 653 (2019).

"The credibility of the witnesses and the weight accorded the evidence are matters *solely for the fact finder* who has the opportunity to see and hear that evidence as it is presented." *Poole v. Commonwealth*, 73 Va. App. 357, 368 (2021) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 328 (2018)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Robinson v. Commonwealth*, 70 Va. App. 509, 513 (2019) (quoting *Jackson*, 443 U.S. at 319). "The conclusions of the fact finder on issues of witness credibility 'may only be disturbed on appeal if this Court finds that [the witness'] . . . testimony was inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Moyer v. Commonwealth*, 33 Va. App. 8, 28 (2000) (*en banc*) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 858 (1991)).

"If any person has sexual intercourse with a complaining witness, whether or not his or her spouse . . . and such act is accomplished (i) against the complaining witness's will, by force, threat or intimidation . . . he or she shall be guilty of rape." Code § 18.2-61(A). G.T. testified that appellant drove her to an alley so narrow that she could not open the car door. Appellant, who had tried to convince G.T. to have sex before, then extended the car seat, got on top of G.T., told her that young girls like to see an older man take control, pinned her down, and inserted his penis into her vagina. He had sexual intercourse with her for four to five minutes, despite the fact that G.T. not only told him "no" and asked him to stop, but also physically struggled with him to try to prevent him from removing her pants. When appellant was finished, he wiped blood off his penis and drove G.T. home. Contrary to appellant's assertion, G.T.'s account is not inherently unbelievable or so contrary to human experience as to render it unworthy of belief.

While "a conviction for rape and other sexual offenses may be sustained solely upon the uncorroborated testimony of the victim," *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005),

in this case G.T.'s testimony was corroborated by her friend, her godmother, and appellant's own statements. G.T.'s friend confirmed that G.T. called her at approximately 11:40 a.m. on the morning of the incident—only forty minutes after appellant first picked G.T. up from her home—and told her that appellant had forced himself on her and that she had been raped. The friend described G.T. as "shocked." G.T. also told her mother and godmother within days of the offense. "[U]nder a rule unique to [sexual assault] trials, evidence of an out-of-court complaint by a victim is admissible, not as independent evidence of the offense, but as corroboration.'" *Id.* at 83 (alteration in original) (quoting *Lindsey v. Commonwealth*, 22 Va. App. 11, 14 (1996)). When Evans, the godmother, asked appellant why he did not stop when G.T. asked him to, appellant responded that a lot of hot girls say stop, even though they don't mean it. Appellant then apologized after learning that G.T. was a virgin, without any further denial that he raped her. Additionally, upon his arrest, appellant said that he had sex with "the girl" twice and that he had a problem putting his "dick in everything."

Ignoring all of this, appellant urges this Court to reverse his conviction as wholly unsupported by the evidence, largely because he proffered an alibi and also because G.T.'s testimony contained inconsistencies. Appellant suggests that this is a case of mistaken identity, if not a purposeful and false allegation of rape against an innocent man. However, G.T. and Evans both identified appellant in court, and G.T., who met with appellant multiple times before the incident, identified appellant in a photo lineup. Appellant's real name matched the name G.T. had seen on his hospital tag. The hospital tag confirmed appellant's presence at the hospital, where his fiancée was having a baby—and the fact that he was having a baby explained the baby clothes and diapers in his car. This corroborating evidence rebutted claims that this was a case of mistaken identity—and supported testimony that appellant was the person who interacted with G.T. in July and August of 2020.

G.T.'s testimony did contain inconsistencies pertaining to how many times she spoke with appellant after the incident, what time the incident occurred, whether her mother was home or at the store when G.T. got home after the incident, the timing of when she learned appellant's fiancée, rather than his sister, was pregnant, the color of appellant's car, whether his underwear was loose or form fitting, and what exactly appellant said to her after the incident. However, these inconsistencies were matters for the jury's consideration. "'Potential inconsistencies in testimony are resolved by the fact finder,' not the appellate court." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)).

The record also does not support appellant's insistence that he was at the hospital at the time of the incident. While the evidence showed appellant was at the hospital at 6:30 a.m. on August 4, the only evidence proving that he remained there all morning came from his fiancée. The jury considered this testimony and clearly rejected it. "The fact finder is not required to believe all aspects of the testimony of a witness." *Parham v. Commonwealth*, 64 Va. App. 560, 565 (2015). "Instead, it may 'accept the parts of a witness' testimony it finds believable and reject other parts as implausible.'" *Id.* (quoting *Moyer*, 33 Va. App. at 28). Thus, while appellant's evidence showed he was in the hospital early that morning, it did not affirmatively prove that he never left to meet with G.T. "When time is not an element of the crime charged, the jury verdict will stand if the evidence is sufficient to prove beyond a reasonable doubt that a crime occurred and that the defendant committed the crime . . . ." *Marlowe v. Commonwealth*, 2 Va. App. 619, 623-24 (1986). We will not disturb the jury's resolution of the inconsistencies in G.T.'s testimony or its conclusion that appellant left the hospital and committed the offense.

Finally, appellant maintains that even if the incident did happen, G.T.'s testimony did not prove that it happened through the use of "force, threat or intimidation." Code § 18.2-61. However, at the time of the offense G.T. was seventeen years old and a virgin, while appellant

was twenty-four years old with a fiancée and newborn child. In the days leading up to the offense, appellant tried to convince G.T. to have sex with him and she refused. On the morning in question, appellant parked his car in a narrow alley—so narrow that G.T. could not open the car door—where he then climbed on top of her and pinned her down. G.T. told appellant to stop and struggled to stop him from removing her pants. However, appellant pinned her hands down, then had sex with her for approximately five minutes. Immediately after the incident, G.T. reported to a friend that appellant "forced" himself on her. These facts support the jury's finding that appellant accomplished the act of sexual intercourse against G.T.'s will by force, threat, or intimidation. Whether or not the evidence adduced at trial was sufficient to prove each of the elements of the offense "is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Massie v. Commonwealth*, 74 Va. App. 309, 319-20 (2022) (quoting *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017)). G.T.'s version of events, believed by the jurors, sufficiently proved all of the elements of rape and supported the conviction beyond a reasonable doubt.

## CONCLUSION

The record in this case contains sufficient evidence on which the jury could conclude that appellant had sexual intercourse with G.T. against her will by force, threat or intimidation. The jury's verdict was not plainly wrong or without evidence to support it. Accordingly, we affirm the conviction.

*Affirmed.*